## CHARLES MORLEY v. C. POWER et al.

1. COMMON SCHOOLS. *Board of directors. Pay of teachers.* It is the duty of the board of directors of a school district to issue a warrant to a teacher for compensation actually earned, which must be paid by the county trustee out of any money of the district in his hands, when presented, or the first money which may thereafter come to his hands not required to meet prior claims, whether the money be received on the apportionment for the year in which the services were rendered, or any other year.

2. SAME. · *Same. Dismissal of teacher.* The board of directors have authority to dismiss a teacher for incompetency, improper conduct, or inattention to duties, upon notice to him of the specific charges, and proof of the charges by the testimony of sworn witnesses, but a notice to the teacher that at a given time and place the board would enquire into his fitness to be continued as a teacher would be insufficient.

3. SAME. *Same.* Under the common school law, the length of the time each year during which the schools shall be kept open, is left to the discretion of the board of directors, acting in good faith and for sufficient cause.

4. SAME. *Same. Contract.* A board of school directors entered into a written contract with a teacher for one year from the date, stipulating that the teacher was to be paid "sixty dollars per month for his services," and after keeping the school open for seven months suspended it for want of funds. *Held,* that the teacher was only entitled to $60 for each month of services while the school was open.

FROM DAVIDSON.

Appeal in error from the Circuit Court of Davidson county. FRANK T. REID, J.

CHARLES MORLEY for Morley.

C. M. BRYAN for Power.

---

Morley *v.* Power.

---

COOPER, J., delivered the opinion of the court.

On August 16, 1880, the then board of school directors of the 13th District of Davidson county and Charles Morley entered into the following contract: "That the said directors have engaged the said Charles Morley as a teacher of school at Watkins' Seminary, in said district, from the 16th day of August, 1880, for one year, and agree to pay him the sum of sixty dollars per month for his services; the said Charles Morley agrees to give instructions in the studies required to be taught in said school and prescribed by the school laws, to such pupils as may attend the said school during the said term, and faithfully discharge the duties required by law of school teachers," etc.

The defendant, Power, was elected a school director of the district in August, and went into office on September 1, 1880. He and the defendant, John Leonard, then constituting a majority of the board, undertook to prevent the petitioner, Morley, from performing the duties of teacher, by appointing another person to the place, and putting him in possession of the school. Morley filed, a petition for a *mandamus* to compel them to re-instate him, and issue a warrant for his salary. Such proceedings were had that on March 6, 1881, a peremptory *mandamus* was awarded by this court as prayed, this court being of opinion, and so adjudging, that Morley was elected teacher of the public school of District 13 on August 16, 1880, for the scholastic term of one year thereafter, and

that he and the board of directors had entered into the written contract provided by law, and, according to the terms thereof, was to receive the salary of sixty dollars per month, during said term. In obedience to the peremptory *mandamus*, the petitioner was, on March 14, 1881, re-instated by the defendants as teacher, and a warrant issued for his salary for seven months.

On the 18th of the same month of March, at a meeting of the board of directors of the 13th district, all three of the directors being present, a resolution was passed by the defendants, Power and Leonard, over the vote of their associate, to stop all of the schools of the district on the ground of a want of funds to carry them on. Notice of the resolution was given to the teachers, and all of the schools were closed on the following Monday, except the school taught by Morley. He continued to teach, although to a diminished number of students, until June 11th, when, as he himself testifies, his labors came to an end, "because the children ceased to attend on account of the heat." The directors declined to recognize the school or to pay Morley for his services. On October 17, 1881, he filed the present petition for a *mandamus* to compel Power and Leonard to issue to him a warrant for the balance of the salary claimed to be due him under the contract.

On March 19, 1881, a notice, signed by the defendant John Leonard, as school director, was served upon Morley, to the effect that on Monday, the 21st inst., at 3 o'clock, at Watkins Seminary, "we will hear proof and determine the question of your fitness to

'be continued as principal teacher of Watkins Semi-nary." On the 21st of March, the Seminary being closed, Power and Leonard seem to have met at Leon-ard's house, and undertook to act upon the matter of the notice, and, as the result, dismissed Morley. They both say that witnesses were examined on the subject, but they do not say that they were sworn, and de-cline to state their names. No minute of the proceed-ing seems to have been kept, or is produced.

In their answer to the alternative writ of *mandamus*, the defendants, Power and Leonard, rely in defense upon the discontinuance of the schools on the 18th, and their removal of the petitioner from his office as teacher on the 21st of March, 1881. They further say that there are no funds belonging to the district for the scholastic year for which the petitioner was employed. The testimony introduced at the hearing, so far as it is material to these issues, presents the facts as above.

If the petitioner is entitled to compensation as a teacher, it was the duty of the defendants to issue to him a warrant for the proper amount, which would be paid out of any money in the hands of the county treasurer when the warrant was presented, or out of the first money which might come to his hands thereafter not required to meet prior claims, whether the money be received on the apportionment for the year when the services were rendered, or any prior or subsequent year: *Bayless* v. *Driskell*, 5 Lea, 265; *Bank* v. *Baber*, 6 Lea, 273.

The board of directors did have authority to dis-

miss the petitioner "for incompetence, improper conduct, or inattention to duties": Act of 1873, ch. 25, sec. 20. But, the power being limited, it was necessary to its exercise that specific charges should be made, and, after notice, established by the testimony of sworn witnesses: *Morley* v. *Power*, 5 Lea, 692. No specific charges, so far as appears, were made in this case, and no witnesses sworn. The notice given to the petitioner was not even as specific as the statute, for it did not advise him whether he would be tried for incompetence, improper conduct, or inattention to duty. It was merely that they would enquire into his "fitness" to be continued as a teacher, and was clearly insufficient.

The only remaining defense rests upon the action of the board on March 18, 1881, in discontinuing the schools, "owing to the financial embarassment of the district," to use the language of the notice served upon the petitioner of the fact of his discharge under the resolution of discontinuance. And the question is whether the discontinuance had the effect, under the circumstances developed in the record, of terminating the petitioner's right to further compensation under his contract.

The school laws contain no positive provision upon the subject of the length of time during the year the common schools should be kept open. There is a legislative recognition, on the face of the act of 1873, that the money derived from the school fund and from taxes imposed by the State on the counties will not be sufficient to keep up the public school for five

months in the year, and the county is clothed with authority, with or without a popular vote, to levy an additional tax "to prolong the schools beyond the five months": Act of 1873, ch. 25, sec. 39. In the enumeration of their duties by the same act, the district directors are required to use the school fund in such manner as will promote the interest of the public schools in their respective districts. By the same act, as amended by the act of 1879, ch. 129, sec. 1, they are authorized to draw upon the county trustee "in favor of the teachers of their district for any school money due such teachers in the hands of the trustee for distribution in their districts, and for any other school money expended under the law for other purposes." The power to draw was intended ordinarily to be limited by the funds "in the hands of the trustee for distribution" in the district. The terms of the school are necessarily dependent upon the amount of these funds. It was certainly never contemplated that the schools should be run beyond the amount of the funds provided for their support. The length of the period of active schooling each year was necessarily left to the control of the board of directors. Making a reasonable allowance for honest errors of judgment in proportioning the expenses to the income, the directors might render themselves personally liable for debts created largely in excess of the revenues of the district: *Bayless* v. *Driskell*, 5 Lea, 268. It would be plainly their duty to keep the schools open as long as the funds would justify, but no longer. The directors, who are interrogated on the subject in this

case, say that the schools were discontinued because the school fund had become exhausted, and one of them adds that the district was then in debt $1,500, and had overdrawn the funds in the hands of the county trustee by $100. And the petitioner himself states in his petition that the trustee claimed about that time that he had overpaid the district by $800. The action of the board seems to have been taken after consultation with the State and county superintendents of the common schools, and, so far as the record shows, to have been justified by the financial condition of the district.

The petitioner, in view of this state of facts, undertook to say in his petition, that two or three thousand dollars of the funds of the district had been improperly expended by the defendants in the payment of teachers unlawfully employed, and of other persons not entitled. But the defendants deny the charge of improper payments, and there is no proof on the subject. The petitioner intended, no doubt, to call in question the payment of teachers employed by the defendants in the place of himself and two other persons, all of whom, upon *mandamus* proceedings, were found by this court to have been improperly removed. But the teachers employed in their places had performed the services required, and were entitled to be paid therefor. They were in no wrong so far as appears, and had earned their compensation. Whether the directors had made themselves liable to the district for the money thus expended, was another question, with which other employees would have nothing

15—VOL. 10.

to do, unless by way of subrogation, and then only by direct proceeding against them individually. In the present proceeding against the defendants as directors to reach the funds of the district in the hands, or which may come to the hands of county trustee, the petitioner has only such rights as his contract confers.

What then are his rights under the contract, in the events that have happened? He concedes he was paid in full up to the dismissal of the schools, and only claims for the remaining five months of the year. The petitioner was engaged for one year from August 16, 1880, and was to be paid "sixty dollars per month for his services." By this contract, did he become entitled to demand and receive sixty dollars for each calendar month of the year, as he claims, or only for each month of actual service while the schools were kept open according to law by the board of directors?

The leading rule in the construction of written contracts is that the contract shall be so interpreted as, if possible, to carry out what the parties meant. And in order to arrive at the intention of the parties, the court should place itself as near as it can, from the facts developed, in the position of the parties, so as to see what they saw and contemplated as their undertaking. While the obligation of a writing is to be gathered mainly from its terms, yet to what that obligation applied, and what duties are to be secured in their performance by the writing, can be fairly ascertained alone from the surrounding circumstances

and the known course of business in such matters:
*Mumford* v. *M. & C. R. R. Co.*, 2 Lea, 393. "In
carrying into effect every sort of contract," says Mr.
Bishop, "the courts, after determining its meaning, are
compelled to consider also and be guided by such
usages and customs as are shown in connection with
it, and the law applicable to the particular case. In
few instances, if any, do the mere interpreted words
furnish the sole rule": Bish. on Con., sec. 607. And
the court will, in all cases, endeavor to give to the
contract a construction which shall make it reasonable
and just: *Halloway* v. *Lacy*, 4 Hum., 468.

The record shows that the schools of the district
opened on September 6, 1880, or were expected by
the petitioner to be opened on that day, after the
contract entered into with the petitioner. They usually
opened on the first Monday of September, and the
testimony shows that they were kept open some years
five or six months, and some years eight or ten
months. If, now, in view of these facts, we place our-
selves in the situation of the contracting parties, and
endeavor to ascertain what they meant by the words
used, it is difficult to avoid the conclusion that their
meaning was that Morley was employed as a teacher
for the succeeding scholastic year, and was to be paid
sixty dollars per month for his actual services in
teaching while the schools were kept open. The con-
tract does not say, and clearly they had no intention
that it should say, that he was to be paid sixty dol-
lars for each month of the entire year. It says "sixty
dollars per month for his services," that is for each

month's service rendered as a teacher. It is not pre-
tended that he had any duties to perform when the
schools were not in session, or that he did in fact
perform any services during that period. He was to
be paid for services at the rate specified per month.

This conclusion is rendered more certain for another
reason. The act of 1873 expressly requires: "That
written contracts shall be made with all public school
teachers at fixed rates per month before they enter
upon their duties." The meaning manifestly is that,
before the teacher begins to teach, there must be a
written contract with him, fixing the rate of pay per
month for his services in teaching. The directors
clearly have no power to contract with him for pay
when there is no school open in which he can teach.
If, by reason of a want of funds, the schools can only
be run five months during the year, the directors can-
not, under the statute, make a valid contract to pay
him a salary for the other five months. They might
bind themselves individually, if they chose to do so,
but they could not charge the school funds by such a
contract. Now, the settled rule is that if the terms
of a written contract admit of two meanings, or of
having effect in two ways, by one of which the thing
would be unlawful and the other lawful, the latter
construction must be adopted: Bish. on Con., sec. 583.
The contract in this case was intended to be lawful,
for services to be performed, and to be paid for at a
fixed rate for each month of actual performance. And
even if both parties thought at the time that the
services would be required for the longest period in

which the schools were usually run during the year, yet if in fact they could not be run the full term for want of funds to pay the expenses, the district treasury can only be held liable for the salary during the period they were kept open.

Whether the rule would be the same if the schools were stopped without just cause, it is unnecessary to consider.

Affirm the judgment.